967 F.2d 624
 140 L.R.R.M. (BNA) 2704, 296 U.S.App.D.C. 257,
122 Lab.Cas. P 10,243
 GREAT LAKES CHEMICAL CORPORATION, C & N General Services,
Inc., Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
Oil, Chemical and Atomic Workers International Union, Local
3-724, Intervenor.
 Nos. 90-1304, 90-1393 and 91-1014.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 13, 1992.
Decided June 19, 1992.
 
 Donald B. Ayer, with whom Patricia A. Dunn, Deena B. Jenab, Washington, D.C., and Andrew M. Kramer, Cleveland, Ohio, were on the brief, for petitioners in 90-1304 and 91-1014.
 Nancy J. Gottfried, Attorney, NLRB, with whom Jerry M. Hunter, General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, and Peter Winkler, Washington, D.C., were on the brief, for respondent in 90-1304 and 91-1014, and petitioner in 90-1393.
 D. Bruce Shine, Kingsport, Tenn., was on the reply brief for respondent C & N General Services, Inc. in 90-1393.
 John W. McKendree, Denver, Colo., and Kathleen A. Hostetler, Lakewood, Colo., entered appearances for intervenor in 90-1304.
 Before D.H. GINSBURG, HENDERSON, and RANDOLPH, Circuit Judges.
 Opinion for the Court filed by Circuit Judge D.H. GINSBURG.
 D.H. GINSBURG, Circuit Judge:
 
 
 1
 Petitioner Great Lakes Chemical Corporation, as the purchaser of a chemical manufacturing plant, succeeded to the seller's obligation to bargain with the incumbent union when a majority of the workers it hired were former employees of the seller. The National Labor Relations Board found that Great Lakes refused to bargain with the union and that it discriminated generally against union adherents when it hired new employees. The Board ordered Great Lakes to bargain with the union and to make whole all of the seller's employees, including both those it had refused to hire and those it had hired at reduced wages via a "temporary services agency," petitioner C & N General Services, Inc.
 
 
 2
 Great Lakes no longer contests that it discriminated against former union officials, but contends that the Board cannot lawfully determine that it discriminated against other union members absent evidence specific to each employee. Moreover, Great Lakes objects that the Board's inclusion of the C & N employees in the bargaining unit impermissibly expands its bargaining obligation beyond that of its predecessor.
 
 
 3
 We conclude that substantial evidence supports the Board's finding that Great Lakes' discrimination was prejudicial to all former Syntex employees, entitling all to relief. We also uphold the Board's inclusion of C & N employees in the bargaining unit in light of the Board's finding that Great Lakes and C & N were joint employers. Therefore, we deny the petitions and enforce the Board's order in all respects.
 
 I. BACKGROUND
 
 4
 In February 1984, Syntex Chemicals, Inc. closed its Newport, Tennessee plant and laid off the approximately 80 employees, all of whom were members of the Oil, Chemical, and Atomic Workers International Union, Local 3-724. According to the Board, "Syntex informed the Union and the employees that the employees would be part of the package when Syntex sold the plant. Relying on this, the Union negotiated extended recall rights in lieu of severance pay."
 
 
 5
 Petitioner Great Lakes purchased the Newport plant in June 1984 and immediately set about scheming to avoid the obligation of a successor employer to bargain with the Union. Before Great Lakes reopened the plant, personnel manager Bill McCord went to Newport, assessed the labor market there, and recommended that the Company
 
 
 6
 [h]ire a core of 16-20 experienced Syntex employees at a top rate of slightly more than their former rate. After this core of good experienced employees is in place, hire only trainee type individuals who have not worked for Syntex. ... Let it be clearly understood (with our new employees) that: We wish to operate on a non-union basis.
 
 
 7
 McCord also described several Union officers as "trouble makers," reported that the former Union officers were even worse, and recommended that the Company "avoid" hiring members of either group.
 
 
 8
 When Great Lakes reopened the plant, this same McCord was put in charge of staffing. Not surprisingly, therefore, after hiring "a core [group of] experienced Syntex employees," the Company took care not to hire a majority of the new workforce from among former Syntex employees: The Company used support for the Union as a virtual litmus test in hiring decisions and kept a running tally of Union members it had hired.
 
 
 9
 Unable adequately to staff the plant in this way, Great Lakes began in early 1985 to employ Syntex employees indirectly through a personnel service known as C & N. Although paid by C & N, these employees worked exclusively at the Newport plant under Great Lakes' supervision and subject to termination by Great Lakes management. (Until December 1985, Great Lakes was C & N's only customer, and C & N was Great Lakes' only supplier of contract labor at the Newport plant.)
 
 
 10
 In order to get skilled and experienced labor, Great Lakes hired an increasing number of former Syntex employees (either directly or through C & N). In February 1985, the Union, claiming to represent a majority of Great Lakes' employees, demanded that the Company recognize it as the exclusive bargaining agent of the Newport employees. Great Lakes refused, giving no reason. In December 1985, the Union renewed its demand for recognition, but Great Lakes again rebuffed it, this time claiming that a majority of the employees had indicated that they did not want a union. The Union then filed unfair labor practice charges against Great Lakes.
 
 
 11
 The Board found that Great Lakes succeeded to Syntex's bargaining obligation because Great Lakes continued to operate the Newport plant in much the same manner as had Syntex, and by April 1985 former Syntex unit members constituted a majority of its workforce. The Board held that Great Lakes had refused to bargain with the Union, in violation of § 8(a)(5) of the National Labor Relations Act, and had refused to hire former Syntex employees because of their prior Union activities, in violation of §§ 8(a)(1) and (3). The Board further concluded that because Great Lakes controlled "every aspect of the C & N employees [sic] work activities including the hiring and firing," either "Great Lakes and C & N are joint employers or ... C & N acted as a[n] agent for Great Lakes. ... In either case, both are jointly and severally liable for any unfair labor practices committed."
 
 
 12
 While the hearings into these unfair labor practices were in progress, C & N began requiring as a condition of employment that each employee sign a statement waiving his right to bring an action against C & N if laid off or terminated. The Board additionally found that this requirement chilled the employees' rights to engage in union activities and to have recourse to the Board, in violation of §§ 8(a)(1) and (4) of the Act.
 
 
 13
 The Board (1) ordered Great Lakes, among other things, to: (a) bargain with the Union; (b) offer employment and back pay to all former Syntex employees; and (c) offer direct employment to C & N employees working at Great Lakes and pay them any back wages or benefits they would have received if Great Lakes had employed them directly from the outset; and (2) ordered C & N to remove the employee waivers from its personnel files. See Great Lakes Chemical Corp., 298 N.L.R.B. No. 80 (1990). Great Lakes and C & N now petition for review, and the Board cross-petitions for enforcement of its order.
 
 II. ANALYSIS
 
 14
 Great Lakes contends that the order to make whole all former Syntex employees is not supported by substantial evidence that Great Lakes discriminated against all such employees; the inclusion of C & N employees in the bargaining unit is contrary to law; and the remedial order is punitive. In its reply brief, petitioner C & N additionally disputes the Board's requirement that it purge its files of the waivers it required its employees to sign.
 
 A. Substantial Evidence
 
 15
 Although "nothing in the federal labor laws requires that an employer ... who purchases the assets of a business be obligated to hire all of the employees of the predecessor," the acquiring company is obligated not to discriminate against union employees in its hiring. Howard Johnson Co. v. Detroit Local Joint Executive Bd., Hotel & Restaurant Employees, 417 U.S. 249, 261, 94 S.Ct. 2236, 2243, 41 L.Ed.2d 46 (1974) (citations omitted); NLRB v. Burns Int'l Security Serv., Inc., 406 U.S. 272, 280 n. 5, 92 S.Ct. 1571, 1578 n. 5, 32 L.Ed.2d 61 (1972). In this respect, a successor employer is under no greater--but also no lesser--obligation not to discriminate than any other employer subject to the NLRA.
 
 
 16
 An employer's mere failure to hire a union member does not, of course, violate § 8(a)(3); union animus is a necessary element of any violation. See Elastic Stop Nut Div. of Harvard Indus. v. NLRB, 921 F.2d 1275, 1280 (D.C.Cir.1990). Whether an employer's actions were prompted by union animus is a question of fact, see Teamsters Local Union No. 171 v. NLRB, 863 F.2d 946, 955 (D.C.Cir.1988), and the Board may rely upon both direct and circumstantial evidence in determining the employer's motive. See NLRB v. Link-Belt Co., 311 U.S. 584, 597, 61 S.Ct. 358, 365, 85 L.Ed. 368 (1941); Williams Enterprises, Inc. v. NLRB, 956 F.2d 1226, 1238 (D.C.Cir.1992). Even after the Board's General Counsel has made out a prima facie case under § 8(a)(3) by evidence that the employer acted out of union animus, there is no violation if "the employer [can] establish by a preponderance of the evidence that it would have taken the action regardless of the existence of such animus." Elastic Stop Nut, 921 F.2d at 1280; see also NLRB v. Wright Line, 251 N.L.R.B. 1083 (1980).
 
 
 17
 General Animus: Great Lakes argues that because it ultimately hired a union majority there cannot be substantial evidence that it harbored a general animus toward the Union. For this it relies upon Sun Coast Foods, Inc., 273 N.L.R.B. 1642 (1985). In that case the successor employer hired its entire workforce of 51 from among its unionized predecessor's pool of 70 employees, but was charged with discriminating on the basis of union activity because it did not hire the remaining 19 employees. The Board found insufficient evidence that Sun Coast's decision to hire a smaller workforce reflected anti-union sentiment, which had been expressed by some supervisors, as opposed simply to a more efficient operation. The employer's having "selected its entire work force from employees of its predecessor ... strongly militate[d]" against inferring that the employer shared the union animus of the supervisors. Id. at 1644.
 
 
 18
 Unlike the employer in Sun Coast, which willingly hired an all union workforce, Great Lakes tried assiduously to avoid hiring a union majority: first it blacklisted former Union officers and refused to hire more than a core group of Union members; then it used support of the Union as a litmus test in making additional hiring decisions; and finally it tried to fill its remaining personnel needs with inexperienced trainees. To the same end, Great Lakes channeled its hiring process through C & N, and maintained a running total of Union members among its ranks. In the present case, therefore, substantial evidence in the record supports the Board's finding that the Employer harbored a general animus toward the Union.
 
 
 19
 Even in the teeth of this evidence, Great Lakes maintains that its "actual hiring of union members more often than not belies any basis for finding that group animus pervaded its hiring decisions." We think the more reasonable inference is that the Employer's discriminatory design ultimately failed, not that it wasn't tried. Nor was it without effect before it collapsed; the Board specifically found that the Employer's anti-union efforts postponed the day when the Union achieved majority status among Great Lakes' employees. Thus we conclude that substantial evidence supports the Board's finding of generalized Union animus.
 
 
 20
 Individual Evidence: Great Lakes further claims that the Board may not order make whole relief for all former Syntex employees except upon the basis of "specific evidence tending to show [anti-union] discrimination in the instance of each employee" not hired. This claim neglects the broadly damning character of the evidence that the Employer acted out of general animus toward the Union; for the evidence of Great Lakes' wholesale rejection of former Syntex employees because they were Union members is, by its nature, equally applicable to each employee. Retail proof with regard to each individual would be surplusage; the larger scheme necessarily entailed refusing to hire individual employees. The record thus supports the Board's initial inference that any Syntex employee not hired was turned away because of his union adherence. The Board did not abuse its discretion, therefore, by ordering make whole relief for all former Syntex unit members.
 
 
 21
 Legitimate Business Reason: Alternatively, Great Lakes argues that it demonstrated by a preponderance of the evidence that it hired some employees through C & N rather than directly for the legitimate business reason that it faced "variable and fluctuating production demands." (Of course, this argument would not rebut the § 8(a)(3) charge with respect to former Syntex employees who were not hired either by Great Lakes or by C & N.) The Employer does not explain why fluctuating production demands would lead it to prefer to use C & N employees rather than its own. We will assume, however, that there might be a legitimate business reason for an employer to prefer to use contract workers to buffer variation in its need for labor.
 
 
 22
 The Board rejected Great Lakes' reason as a pretext. It found that the Employer's production varied from the time that Great Lakes bought the Newport plant, but Great Lakes turned to C & N for "temporary" employees only after the Union made its first demand for bargaining. In addition, the Board found on the basis of an internal Company memorandum that Great Lakes "had trouble getting competent experienced employees from C & N because these type [sic] of employees did not want to work on a temporary basis at lower wages with no benefits." Fluctuating product demand does not obviously explain why Great Lakes would want to hire inexperienced employees while seasoned hands were available. The difference in their union status does. Thus, the Board reasonably concluded that Great Lakes' explanation for hiring through C & N was "pretextual."
 
 
 23
 Relatedly, Great Lakes argues that the Board's "finding that [it] used C & N to avoid hiring Syntex unit employees onto its payroll is contradicted by the fact that, promptly after turning to C & N, Great Lakes hired a majority of former union members directly onto its payroll as permanent employees." In fact, some months intervened. Be that as it may, however, Great Lakes' later hiring enough Union members to constitute a majority of its work force--apparently out of necessity when all else failed--is not sufficient to establish, in light of all the evidence of Union animus recounted above, that it did not earlier discriminate against Union adherents. We conclude that Great Lakes did not demonstrate by a preponderance that its hiring pattern was motivated by a legitimate business purpose.
 
 B. The Bargaining Unit
 
 24
 Great Lakes argues that the Board exceeded its authority by including in the bargaining unit all C & N employees working at Great Lakes. As the successor to Syntex, Great Lakes maintains, it cannot be required to bargain with respect to a unit broader than was in place under its predecessor. Be that as it may, the Board did not in fact require it to recognize a broader unit; the Board required Great Lakes to recognize only the Union's representation of "C & N employees working in the unit classifications at Great Lakes."
 
 
 25
 True, the original unit at Syntex did not include C & N contract workers. The Board found that Great Lakes and C & N were joint employers, however, largely because "Great Lakes controlled every aspect of the C & N employees [sic] work activities." As a consequence, the Board properly treated C & N's employees as if Great Lakes had hired them directly. And had Great Lakes hired them directly, there could be no question that they are properly part of the bargaining unit. See Burns, 406 U.S. at 277-81, 92 S.Ct. at 1579.
 
 C. The Remedy
 
 26
 Great Lakes maintains that to require it to make whole all of Syntex's former employees is punitive. Claiming that the Board failed to consider whether Great Lakes might have a lawful reason for not hiring some of those employees, Great Lakes seeks "the opportunity to show that fewer jobs are or will be available, or that the company might legitimately choose to hire someone other than [a former Syntex unit member]."
 
 
 27
 The Board has broad authority in "devising remedies to effectuate the policies of the Act," NLRB v. Seven-Up Bottling Co., 344 U.S. 344, 346, 73 S.Ct. 287, 288, 97 L.Ed. 377 (1953), subject only to limited judicial review. See Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 216, 85 S.Ct. 398, 406, 13 L.Ed.2d 233 (1964). Nevertheless, the Board's order must truly be remedial, not punitive, and must be designed to "restor[e] the economic status quo that would have obtained but for the company's [wrongdoing]." NLRB v. J.H. Rutter-Rex Mfg. Co., 396 U.S. 258, 263, 90 S.Ct. 417, 420, 24 L.Ed.2d 405 (1969).
 
 
 28
 On its face, the Board's order does require Great Lakes to offer employment to all former Syntex employees. In its brief, however, the Board allows that in compliance proceedings Great Lakes "will ... have the opportunity to show that particular former Syntex employees are unsuitable for rehire," citing Packing House and Indust. Serv., Inc. v. NLRB, 590 F.2d 688, 698 n. 12 (8th Cir.1978) (an employer must "have an opportunity to assert all recognized defenses related to compliance hearings"); cf. Kallmann v. NLRB, 640 F.2d 1094, 1102 (9th Cir.1981) (denying enforcement of order requiring successor employer to hire all former employees without providing opportunity to show that fewer jobs were available).
 
 
 29
 Therefore, we reject as premature Great Lakes' present objection to the apparent breadth of the Board's order. Any recognized defense to the order's implementation can be raised by a petition to review the compliance order. See, e.g., Local 512, Warehouse & Office Workers' Union v. NLRB, 795 F.2d 705, 715 (9th Cir.1986).
 
 D. The Waivers
 
 30
 C & N did not file its own initial brief in this proceeding, choosing instead to rely upon Great Lakes' legal arguments. In a separate reply brief, however, C & N challenges the Board's requirement that C & N purge from its files "all unlawful waivers of the right to take legal action executed by employees."
 
 
 31
 Having been raised for the first time in a reply brief, C & N's argument is untimely and we do not consider it. Fairness to the Board and our own concern to avoid making an ill-informed decision counsel as much, as circuit practice attests. See, e.g., Town of Norwood v. FERC, 962 F.2d 20, 25 (D.C.Cir.1992); McBride v. Merrell Dow and Pharmaceuticals, Inc., 800 F.2d 1208, 1210 (D.C.Cir.1986).
 
 III. CONCLUSION
 
 32
 The Board's order requiring Great Lakes to make whole all former Syntex unit employees is supported by substantial evidence. Including in the bargaining unit all C & N employees working at Great Lakes is appropriate; their employment by C & N rather than by Great Lakes is but an artifice set up to evade the NLRA, and as such is not entitled to recognition by the NLRB. Accordingly, we deny the petitions of Great Lakes and C & N, and grant in all respects the Board's cross-petition for enforcement.
 
 
 33
 So ordered.